Approved:  _Kristy J. Greenberg_
           Kristy J. Greenberg
           Assistant United States Attorney

Before:    HONORABLE HENRY B. PITMAN
           United States Magistrate Judge
           Southern District of New York

**15 MAG 4583**

---

UNITED STATES OF AMERICA

              - v. -

ALONZO KNOWLES,
   a/k/a "Jeff Moxey,"

              Defendant.

---

**COMPLAINT**    ·**DOC #**____ —

Violations of
17 U.S.C. § 506; 18 U.S.C.
§§ 1028, 2319

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

          Michael MacDonald, being duly sworn, deposes and says
that he is a Special Agent with the Department of Homeland
Security, Homeland Security Investigations ("HSI") and charges
as follows:

## COUNT ONE
### (Criminal Copyright Infringement)

          1.   On or about December 21, 2015, in the Southern
District of New York and elsewhere, ALONZO KNOWLES, a/k/a "Jeff
Moxey," the defendant, unlawfully, willfully, and knowingly did
infringe copyrights for purposes of commercial advantage and
private financial gain by the reproduction and distribution,
including by electronic means, during a 180-day period, of ten
and more copies and phonorecords, of one and more copyrighted
works, which had a total retail value of more than $2,500, to
wit, without authorization, KNOWLES distributed copies of 15
copyrighted scripts of movies and television shows, which have
not yet been publicly released, to an undercover law enforcement
agent in exchange for $80,000 in New York, New York.

     (Title 17, United States Code, Section 506(a)(1)(A) and Title
          18, United States Code, Section 2319(b)(1).)

## COUNT TWO
### (Identity Theft)

2.    From on or about December 15, 2015, up to and
including on or about December 21, 2015, in the Southern
District of New York and elsewhere, ALONZO KNOWLES, a/k/a "Jeff
Moxey," the defendant, would and did knowingly transfer,
possess, and use, without lawful authority, a means of
identification of another person, knowing that the means of
identification belong to another actual person, with the intent
to commit, or to aid or abet, or in connection with, any
unlawful activity that constitutes a violation of Federal law or
a felony under any applicable State or local law, to wit,
KNOWLES transferred Social Security numbers, driver's license
numbers, a passport number, dates of birth, and a bank account
number belonging to other individuals to an undercover law
enforcement agent located in New York, New York, which
information KNOWLES obtained from gaining unauthorized access to
the computers of those individuals, in violation of Title 18,
United States Code, Section 1030(a)(2).

(Title 18, United States Code, Section 1028(a)(7).)

\* \* \*

The bases for my knowledge and for the foregoing charges
are, in part, as follows:

3.    I have been a Special Agent with HSI for approximately
eight years.  For approximately one year, I have been assigned
to the El Dorado Task Force in HSI's New York Field Office,
during which I have conducted investigations of computer
hacking, money laundering, and white collar fraud. I have
received training regarding fraud and computer hacking.  I have
been personally involved in the investigation of this matter.
This affidavit is based upon my investigation, my conversations
with other law enforcement agents, and my examination of
reports, records, and other evidence.  Because this affidavit is
being submitted for the limited purpose of establishing probable
cause, it does not include all the facts that I have learned
during the course of my investigation.  Where the contents of
documents and the actions, statements, and conversations of
others are reported herein, they are reported in substance and
in part, except where otherwise indicated.

## OVERVIEW OF KNOWLES'S SCHEME TO SELL CELEBRITIES' PRIVATE AND CONFIDENTIAL INFORMATION

4.     As set forth below, ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, unlawfully accessed the personal e-mail accounts of numerous individuals in the entertainment, sports and media industries (the "Victims").  From their e-mail accounts, KNOWLES stole copyrighted scripts of movies and television shows that had not yet been publicly released, personal identifying information, such as Social Security numbers, and private sexually explicit photographs and videos.

5.     In December 2015, ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, offered to sell the stolen material to an individual who, unbeknownst to KNOWLES, was an undercover law enforcement agent (the "UC").  KNOWLES claimed to the UC that he had "exclusive content" that was "really profitable" and worth "hundreds of thousands of dollars."  KNOWLES stated that he obtained the material directly from the Victims without their knowledge, and claimed to be able to acquire additional such material from other celebrities and entertainment, sports, and media industry professionals.  KNOWLES showed the UC a list of the e-mail addresses and phone numbers of at least 130 such individuals that he had in his possession.

6.     On December 21, 2015, during a meeting with the UC in New York, New York, ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, claimed to use two different methods to gain unlawful access to Victims' e-mail accounts.  One method, according to KNOWLES, involved sending a "virus" to the Victim's computer which would enable KNOWLES to access it.  The other method involved KNOWLES e-mailing a false notification to the Victim stating that the Victim's e-mail account had been hacked, and asking for the Victim's passcodes.  Either way, once KNOWLES had successfully accessed the Victim's e-mail account, KNOWLES, unbeknownst to the Victim, changed the settings in the Victim's e-mail account in order to maintain ongoing access to it. KNOWLES attempted to sell numerous movie and television scripts and personal identifying information that he had unlawfully obtained from the Victims to the UC in exchange for approximately $80,000, whereupon KNOWLES was arrested.

## KNOWLES'S ATTEMPTS TO SELL STOLEN SCRIPTS TO A POPULAR RADIO HOST

7.     From speaking with other law enforcement officers, I learned, in substance and in part, that in early December 2015,

3

representatives of an American premium cable and satellite television network ("TV Network-1") contacted HSI because they had been informed by the executive producer (the "Executive Producer") of a popular drama television series airing on TV Network-1 ("TV Series-1") that an individual may have obtained unauthorized access to scripts of the upcoming season of TV Series-1. In particular, a popular radio host ("Witness-1") had contacted the Executive Producer because Witness-1 had received an unsolicited offer, by e-mail, from an individual who offered to sell Witness-1 scripts of upcoming episodes of TV Series-1.

8. Based on my conversations with Witness-1 and other law enforcement officers, as well as my review of e-mail messages provided by Witness-1 to law enforcement, I have learned the following, in substance and in part:

a. On or about December 4, 2015, Witness-1 received e-mail messages from a particular e-mail address with the header name "jeff moxey," which was later identified as belonging to and used by ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant (the "Knowles E-mail Account"). In those e-mails, KNOWLES claimed to have "full scripts of episodes 1-6" of an upcoming season of TV Series-1. KNOWLES stated that episode 6 of TV Series-1 is currently being filmed, and claimed that he was "certainly capable of getting the rest of the episodes as they are completed." In an e-mail to the UC, KNOWLES also attached screenshots of certain pages of a script of a yet to be aired episode of TV Series-1 (the "TV Series-1 Script Screenshots"). The TV Series-1 Script Screenshots contained a watermark with the name of a particular actress on TV Series-1 ("Victim-1"). KNOWLES asked Witness-1 if there was an offer to purchase the stolen TV Series-1 scripts in Knowles's possession, and Witness-1 responded that Witness-1 would get back to KNOWLES.

b. On or about December 5, 2015, KNOWLES sent messages from the Knowles E-mail Account to Witness-1's phone number. When Witness-1 asked how KNOWLES obtained Witness-1's phone number, KNOWLES claimed to have gotten it from "some other celebrity phone contacts." KNOWLES claimed to have "exclusive content" "worth hundreds of thousands of dollars." KNOWLES stated that he was "[j]ust trying to make a few dollars of these stuff that I got."

c. On or about December 7, 2015, using the Knowles E-mail Account, KNOWLES sent Witness-1 a .pdf file of a script of an upcoming American comedy movie ("Movie-1"), that is not publicly available.

4

d.     That same day, KNOWLES sent messages from the Knowles E-mail Account to Witness-1's phone number.   At the direction of law enforcement, Witness-1 discussed with KNOWLES how much KNOWLES would charge for the TV Series-1 scripts. KNOWLES stated that it would be easy to compile the scripts into a book and sell it before the upcoming season of TV Series-1 aired.   KNOWLES suggested that because it is a hit show, Witness-1 could sell 100,000 copies of the book at $20 each, and make $2 million.   KNOWLES also stated that he would have a script for an upcoming hip hop artist biopic movie ("Movie-2") once it is completed at the end of the month.

e.     That same day, at the direction of law enforcement, Witness-1 provided the phone number of the UC to KNOWLES, and stated that the phone number belonged to someone interested in KNOWLES's offer to sell scripts.   KNOWLES then placed a call from a phone number (the "Knowles Phone Number") to the UC, and they discussed speaking the next day.

## KNOWLES'S ATTEMPTS TO SELL SCRIPTS, SEXUALLY EXPLICIT MATERIAL AND PERSONAL IDENTIFYING INFORMATION OF OTHERS TO THE UC

9.     Based on my conversations with the UC, and my review of e-mail messages and consensually recorded video calls with the UC made using the "FaceTime" application, I have learned the following, in substance and in part:

a.     On December 8, 2015, at the direction of law enforcement, the UC attempted to place a FaceTime video call to the Knowles E-mail Account, but did not receive a response. Shortly thereafter, KNOWLES, using the Knowles E-mail Account, placed a FaceTime video call, which was consensually recorded, to the UC, who was located in New York, New York.   Based on my review of this consensually recorded FaceTime video call (the "December 8 Call"), I have learned the following, in substance and in part:

i.     KNOWLES claimed to have complete scripts for numerous unreleased, upcoming movies and television shows, including six TV Series-1 scripts.

ii.     KNOWLES showed the screen of his laptop to the UC, which contained a list of nineteen .pdf files.   During the call, KNOWLES opened the majority of the .pdf files, and he scrolled through each of them.   KNOWLES stated that these

5

scripts were for movies and television shows that had not yet
been released to the public.

          iii.       Several of the scripts had distinctive
markings on them:

           1.  The name of Victim-1 was watermarked on the
scripts of TV Series-1.

           2.  The name of a particular casting director
("Victim-2") was watermarked on a script of a particular
American comedy movie ("Movie-3").

           3.  The name of a particular actress ("Victim-
3") was watermarked on a script of a particular American comedy
movie ("Movie-4").  KNOWLES zoomed in on the Movie-4 Script,
which reflected a copyright dated 2015, with "all rights
reserved."  KNOWLES stated that casting for Movie-4 was
underway, and that Movie-4 was scheduled to be released in 2017.

           4. The name of a popular hip hop artist
("Victim-7") was reflected on a script of a new television show
("TV Series-2").

          iv.      KNOWLES stated that once casting is
completed for a movie and KNOWLES finds out who is in the movie,
it is "easy" for him to get a script for the movie.  KNOWLES
claimed that he gets the scripts directly from the actors, but
stated that the actors do not give him the scripts, nor does he
buy any of the scripts.

          v.       KNOWLES stated that once casting was done
for Movie-2, KNOWLES could get the Movie-2 script.

          vi.      KNOWLES told the UC to let him know if the
UC was interested in obtaining a script of any particular movie.
KNOWLES stated that he would "definitely be doing more business
with you as I get more things.  What else are you interested in?
Just movie scripts?  Or what else?"  When the UC responded by
asking what else KNOWLES had to offer, KNOWLES stated that he
"just got into it," and that he had not been "exploring the
possibilities, but the possibilities are definitely unlimited."

          vii.     After KNOWLES and the UC negotiated, the UC
agreed to pay $75,000 to KNOWLES for all nineteen scripts that
KNOWLES had shown on his laptop to the UC.  KNOWLES stated that
he understood the material he had to be "really profitable."

        viii.     The UC asked to meet KNOWLES in person, and KNOWLES stated that he was in the Bahamas.  The UC asked KNOWLES if he would fly to the United States to exchange the scripts for cash, and KNOWLES agreed to do so.

        b.    On or about December 11, 2015, the UC, who was located in New York, New York, placed a consensually recorded video call using the FaceTime application to KNOWLES at the Knowles E-mail Account, during which KNOWLES made the following statements, in sum and substance:

        i.     KNOWLES would provide the UC with his personal information so that the UC could make his travel arrangements to New York City and pay for incidentals related to this trip.

        ii.    KNOWLES could provide additional movie scripts, as well as private "sex tapes" of other people.  The UC expressed an interest in the sex tapes, and asked KNOWLES to send "a small tidbit" of a sex tape for sale.

        iii.    In response to the UC's inquiry, KNOWLES stated that he gets things straight from the Victims, and that the Victims have no idea what KNOWLES is doing.

        iv.    The UC asked if KNOWLES also could obtain the personal information of additional individuals, and KNOWLES stated that he had a list of contact information, and that personal information was the easiest thing for him to get. KNOWLES then showed the UC a document on his laptop with a list of names with phone numbers and/or e-mail addresses of at least approximately 130 celebrities (the "List").  The names and contact information of Victim-1 and another actress from TV Series-1 ("Victim-4") were on the List.

        v.     In response to a question from the UC, KNOWLES stated that he could get Social Security numbers for a few individuals who keep that information in their personal accounts.

        c.    Later that same day, on December 11, 2015, in an e-mail from the Knowles E-mail Account to the UC, KNOWLES identified himself as "Alonzo Knowles."  KNOWLES provided the Knowles Phone Number, as well as his date of birth, passport number, and Money Gram account number, so that the UC could make travel arrangements for KNOWLES and send KNOWLES money for

incidentals in connection with his trip to the United States to meet with the UC.  KNOWLES also stated "I will send you Some of the stuff later around 2am. Thats the best time for me to do what i do."

        d.   On or about December 12, 2015, KNOWLES sent messages from the Knowles E-mail Account to the UC containing sexually explicit images and a video (the "Victim-6 Sexually Explicit Material") from within the e-mail inbox of another radio host ("Victim-5").  The Victim-6 Sexually Explicit Material had been sent to Victim-5 from a television host and columnist ("Victim-6").  KNOWLES stated that "this is free. This is just a sample of things I can get.  I have more stuff along these lines and can get more if you're interested in these kind of stuff. I will hold all the other stuff as insurance to make sure things go smooth with my trip. If things go well we can continue doing business and i will give you access to more things."[1]

        e.   On December 14, 2015, from the Knowles E-mail Account, KNOWLES told the UC that KNOWLES "can't guarantee you socials because 90% of people hardly post it or send it to anyone but [he] will try."  KNOWLES stated that he can get "scripts, pics, private videos and conversations, numbers, drivers license and passport info."

        f.   On December 15, 2015, KNOWLES used the Knowles E-mail Account to e-mail the UC an image of pages of a passport belonging to a particular movie actor ("Victim-9"), which included, among other things, the passport number and date of birth of Victim-9.  KNOWLES also provided the Social Security number, address, e-mail address, and phone number for Victim-9 to the UC.  The UC replied that if KNOWLES obtained more of this type of information to bring such information to New York City and they would discuss it.

        g.   Later that same day, December 15, 2015, in an e-mail from the Knowles E-mail Account, KNOWLES told the UC to "[h]ave some extra cash on hand im willing to accept more than 100,000 if we negotiate pass that because i now got the [Movie-2 script] as well and a few other scripts" to sell to the UC.

---

[1] The names and contact information of both Victim-5 and Victim-6 were on the List.

h.   On or about December 18, 2015, in e-mail messages between KNOWLES – using the Knowles E-mail Account - and the UC, KNOWLES referenced a public post of Victim-7 about TV Series-2.[2] KNOWLES stated that he had a script of a yet to be aired episode of TV Series-2 to sell to the UC.  KNOWLES also asked if the UC had a limit to what he could spend, as KNOWLES has "a lot of data" and KNOWLES did not want to bring everything as "insurance for a possible next meeting."  The UC responded that he did not have a limit, and that the UC did not need to buy everything in one shot.

i.   On or about December 19, 2015, in an e-mail from the Knowles E-mail Account, KNOWLES told the UC that he had "a very popular A list celebrity ssn along with 30 unreleased tracks towards their upcoming album."

10.   Based on my conversations with the UC, and my review of consensually recorded video and audio recordings of a meeting in New York, New York, between the UC and ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, on December 21, 2015, I have learned the following, in substance and in part:

a.   KNOWLES provided 15 scripts of television shows and movies which have not yet aired (together, the "December 21 Scripts") to the UC.  Among the December 21 Scripts were (i) six scripts of episodes of TV Series-1; (ii) one Movie-1 script; (iii) one Movie-3 script; (iv) one Movie-4 script; and (v) one TV Series-2 script.  KNOWLES showed one Movie-2 script to the UC, but did not provide it to the UC.

b.   KNOWLES provided Social Security numbers for three professional athletes and Victim-3. For one of the professional athletes ("Athlete-1"), KNOWLES provided the UC with a copy of Athlete-1's form of enrollment in a professional sports league, which contained Athlete-1's Social Security number.  For Victim-3, KNOWLES provided the UC with an IRS Notice sent to Victim-3, which contained Victim-3's Social Security number.

c.   KNOWLES played an unreleased track of an upcoming album of a popular singer-songwriter ("Victim-8").  KNOWLES noted that Victim-8's music videos had a lot of views on Youtube.

---

[2] The name and contact information of Victim-7 was on the List.

9

d.    The UC asked KNOWLES to demonstrate that KNOWLES can obtain unauthorized access to another individual's personal account.    KNOWLES replied that there were two problems, the first being that KNOWLES did not "have [his] VPN[3] so they can track back to your IP Address."[4]

e.    KNOWLES identified the second problem as his "social engineering" process, which entails him doing "research on a target."  If KNOWLES is "going after a high profile celebrity," then "it is pretty hard to get them."  So KNOWLES will "go after" celebrities' friends, whom he finds in pictures with the celebrities.  KNOWLES will "hack" the friends of celebrities and "go through their shit" in order to find the phone number of a celebrity.  Then, KNOWLES will "hack the celebrity."

f.    KNOWLES described two ways in which he gained unauthorized access to celebrities' e-mail accounts.  In the first way, KNOWLES will obtain the celebrity's e-mail address, "get their stuff, and [KNOWLES will] basically send them a fake text message making it seem like their account has been hacked. So they write [KNOWLES] back the code [i.e., password] so [KNOWLES] can access it."[5]  Once KNOWLES accesses the celebrity's

---

[3] Based on my training and experience, I know that a VPN (virtual private network) extends a private network across a public network, such as the Internet. It enables users to send and receive data across shared or public networks as if their computing devices were directly connected to the private network, and thus are benefiting from the increased privacy and security of the private network.

[4] Based on my training and experience, I know that an IP Address (Internet Protocol address) is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  A device's IP address can be used to determine its physical location and, thereby, its user.

[5] Based on my training and experience, I believe that KNOWLES is describing a type of "E-mail phishing scam," which is a scheme designed to deceive recipients into divulging private information.  E-mail phishing scams typically involve fraudulent e-mail messages appearing to come from a legitimate source in order to trick individuals into responding with private

e-mail account, he changes the "recovery options."   The UC asked
whether that involves KNOWLES making changes to the celebrity's
information so that KNOWLES knows the answer to their security
questions, and KNOWLES responded: "yes, exactly."[6]   KNOWLES
further explained that, in order to avoid detection, KNOWLES
deleted notifications from the celebrity's e-mail service
provider regarding changes to the settings of the celebrity's e-
mail account.

        g.   The second way that KNOWLES gained unauthorized
access to celebrities' e-mail accounts is if KNOWLES has "access
to their computer" which is "way easier."   If the celebrities
have a computer with a Windows operating system, KNOWLES "can
just send them a virus and get in that way."

        h.   The UC handed $80,000 in cash to KNOWLES for the
December 21 Scripts.   KNOWLES and the UC agreed that KNOWLES
would pay for the Social Security numbers he had provided to the
UC next time.   After KNOWLES accepted the cash, KNOWLES was
arrested.

### KNOWLES DID NOT HAVE AUTHORIZATION TO ACCESS VICTIMS' COPYRIGHTED MATERIALS AND PERSONAL INFORMATION

#### TV SERIES-1

    11.   Based on my conversations with Victim-1, as well as my
review of certain contents of Victim-1's phone and e-mail
accounts, I have learned the following, in substance and in
part:

        a.   Victim-1 is an actress on TV Series-1, and is
currently filming TV Series-1.   The upcoming season of TV
Series-1 is set to air in 2016.

---

information (e.g., passwords).   Criminals may then use this
private information to access the e-mail accounts belonging to
other individuals.

[6] Based on my training and experience, I know that, generally
speaking, if a user is unable to access his e-mail account, e-
mail service providers have "recovery options" which allow users
to recover information, such as usernames and passwords, in
order to gain access to their e-mail accounts.   Typically, a
user must answer security questions correctly in order to obtain
the username or password for an e-mail account.

       b.   Victim-1 did not provide any of Victim-1's TV Series-1 scripts to anyone else, nor was she aware of anyone having access to Victim-1's TV Series-1 scripts.

       c.   In or about September 2015, Victim-1's phone account information was compromised.

       d.   In or about early December 2015, suspicious activity was detected in Victim-1's e-mail accounts ("Victim-1 E-mail Account-1" and "Victim-1 E-mail Account-2") and Victim-1's Apple account, the latter of which contained a list of Victim-1's passwords to various accounts, including Victim-1's e-mail accounts.

       e.   Victim-1 provided to law enforcement information from the service provider for the Victim-1 E-mail Account-1. Based on my review of that information, it appears that on or about December 3, 2015, Victim-1's phone was accessed from a location in the Bahamas on or about December 3, 2015 at 2:29 a.m.

       f.   Prior to this suspicious activity in December 2015, Victim-1 had been receiving TV Series-1 scripts on the Victim-1 E-mail Account-2, and those scripts were watermarked with Victim-1's name on them.

   12.   Based on my conversations with Victim-4, I have learned the following, in substance and in part:

       a.   Victim-4 is an actress on TV Series-1.

       b.   Victim-4 did not provide any of Victim-4's TV Series-1 scripts to anyone else, nor was she aware of anyone having access to Victim-4's TV Series-1 scripts.

       c.   In or about September 2015, Victim-4's phone account information was compromised.  Also during the same time period, suspicious activity involving the use of Victim-4's Social Security number without Victim-4's knowledge or consent was detected in connection with Victim-4's PayPal account.

   13.   Based on my conversations with employees at TV Network-1, I have learned the following, in substance and in part:

a.   The six TV Series-1 scripts offered for sale by ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, are protected by copyright.

b.   No one other than the individual whose name is watermarked on the TV Series-1 episode script is authorized to possess the script.  It is prohibited to make copies of the TV Series-1 scripts, as they are not for public dissemination, and their secrecy prior to the airing of each episode is significant to the success of TV Series-1.

## TV SERIES-2

14.  Based on my conversations with employees at another television network ("TV Network-2"), I have learned the following, in substance and in part:

a.   The TV Series-2 script offered for sale by ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, is copyrighted.

b.   No one other than the individual whose name is watermarked on the TV Series-2 script is authorized to possess the script.  It is prohibited to make copies of the TV Series-2 script, as it is not for public dissemination, and the secrecy of the script prior to the public release of TV Series-2 is significant to its success.

## MOVIE 1 AND MOVIE-3

15.  Based on my conversations with Victim-2, I have learned the following, in substance and in part:

a.   Victim-2 was a casting director for Movie-3.

b.   Victim-2's Movie-3 scripts had Victim-2's name watermarked on them, and Victim-2 received Movie-3 scripts via e-mail.

c.   Victim-2 did not provide any of Victim-2's Movie-3 scripts to anyone else, nor was Victim-2 aware of anyone having access to Victim-2's Movie-3 scripts.

16.  Based on my conversations with employees at the particular movie studio responsible for producing Movie-1 and Movie-3 ("Studio-1"), I have learned the following, in substance and in part:

a.    The Movie-1 script offered for sale by ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, is protected by copyright.

b.    The Movie-3 script offered for sale by KNOWLES is protected by copyright.

c.    For both Movie-1 and Movie-3, no one other than the individual whose name is watermarked on the movie script is authorized to possess the script.  It is prohibited to make copies of the scripts of Movie-1 and Movie-3, as they are not for public dissemination, and the secrecy of the scripts prior to the public release of Movie-1 and Movie-3 is significant to their success.

<u>MOVIE-4</u>

17.  Based on my conversations with Victim-3, I have learned the following, in substance and in part:

a.    Victim-3 was an actress in Movie-4.

b.    Victim-3's Movie-4 scripts had Victim-3's name watermarked on them, and Victim-3 received Movie-4 scripts via e-mail.

c.    Victim-3 did not provide any of Victim-3's Movie-4 scripts to anyone else, nor was Victim-3 aware of anyone having access to Victim-3's Movie-4 scripts.

d.    Over the last week, suspicious activity was detected in Victim-3's Apple account.

18.  Based on my conversations with employees at a movie studio ("Studio-2"), which is responsible for producing Movie-4, I have learned the following, in substance and in part:

a.    The Movie-4 script offered for sale by ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, is copyrighted.

b.    No one other than the individual whose name is watermarked on the movie script is authorized to possess the script.  It is prohibited to make copies of the Movie-4 script, as it is not for public dissemination, and the secrecy of the script prior to the public release of Movie-4 is significant to its success.

## THE VICTIM-6 SEXUALLY EXPLICIT MATERIAL

19.   Based on my conversations with Victim-5, I have learned the following, in substance and in part:

a.   Victim-5 had received communications via e-mail from Victim-6.

b.   Victim-5 did not share with or send to anyone else any sexually explicit material involving Victim-6.

20.   Based on my conversations with Victim-6, I have learned the following, in substance and in part:

a.   Victim-6 sent the Victim-6 Sexually Explicit Material to Victim-5 via e-mail.

b.   Victim-6 did not send the Victim-6 Sexually Explicit Material to anyone else, nor did Victim-6 authorize anyone else to possess, access or send it.

WHEREFORE, I respectfully request that ALONZO KNOWLES, a/k/a "Jeff Moxey," the defendant, be arrested and imprisoned or bailed, as the case may be.

Michael MacDonald
Special Agent
Homeland Security Investigations

Sworn to before me this
22nd day of December 2015

HON. HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK